# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

RANDALL BURCH,

>       Petitioner,

-vs-                                                     Case No.  8:09-CV-745-T-27TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,

>       Respondent.

_____/

## <u>ORDER</u>

Petitioner, an inmate in a Florida penal institution proceeding *pro se*, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("petition") challenging a conviction for first-degree murder entered in 2003 by the Twelfth Judicial Circuit Court, Sarasota County, Florida (Dkt. 1), and a memorandum of law in support of the petition (Dkt. 2). Respondent filed a response to the petition (Dkt. 14). Petitioner filed a reply to the response (Dkt. 16).[1]

Respondent asserts no challenge to the petition's timeliness. The matter is now before the Court for consideration of Petitioner's claims. An evidentiary hearing is not required for the disposition of this matter. Rules Governing Section 2254 Cases, Rule 8(a) (2011).

## PROCEDURAL HISTORY

After a jury trial, Petitioner was convicted on August 29, 2005, of first-degree murder of

---

[1]Petitioner subsequently filed an "Addendum" (Dkt. 20) which is an exhibit in support of Ground Two of the petition.

Roland Shane Patrick (Respondent's Ex. 1, Vol. II at 201).  He was sentenced to life in prison (Id. at 322).  The appellate court affirmed Petitioner's conviction and sentence on September 15, 2006 (Respondent's Ex. 5); *Burch v. State*, 940 So. 2d 431 (Fla. 2d DCA 2006) [table].  Petitioner's petition to the Florida Supreme Court for review of the appellate court's decision was dismissed for want of jurisdiction (Respondent's Ex. 12); *Burch v. State*, 946 So. 2d 1069 (Fla. 2006) [table].

On September 6, 2007, Petitioner filed a Motion for Post Conviction Relief pursuant to Rule 3.850, Fla. R. Crim. P. ("3.850 motion") raising five claims of ineffective assistance of trial counsel (Respondent's Ex. 13).  On March 11, 2008, the post conviction court denied Grounds One and Two of the 3.850 motion, and ordered the State to respond to the three remaining grounds (Respondent's Ex. 14).  After the State filed its response (Respondent's Ex. 15), the post conviction court denied the three remaining grounds on May 27, 2008 (Respondent's Ex. 16).  On January 29, 2009, the appellate court affirmed the denial of the 3.850 motion (Respondent's Ex. 18); *Burch v. State*, 999 So. 2d 649 (Fla. 2d DCA 2009) [table].

Petitioner filed his petition in this Court on April 16, 2009 (Dkt.  1).[2]  The petition raises the following four grounds for relief:

Ground One

Trial court ruling on Miranda violation contrary to clearly established law in violation of Fifth and Fourteenth Amendment [sic] of United States Constitution.

Ground Two

Ineffective assistance of counsel for failing to file motion to recuse judge in violation

---

[2]Although Petitioner's petition was received by this Court on April 20, 2009, Petitioner delivered his petition to prison officials for mailing on April 16, 2009 (Dkt. 1 at 1). Under the mailbox rule set out in *Houston v. Lack*, 487 U.S. 266 (1988), a document is deemed filed by a *pro se* prisoner when it is delivered to prison authorities for forwarding to the court.

of Sixth and Fourteenth Amendment [sic] of United States Constitution.

Ground Three

Ineffective assistance of counsel for failing to properly object to use of victim's mother to introduce photo of victim to preserve for direct appeal.

Ground Four

Ineffective assistance of counsel for failure to cross-examine FDLE expert witness Rosemary Jassoy.

## STANDARDS OF REVIEW

Under 28 U.S.C. § 2254(d) and (e) as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court's review of the state court's factual findings is highly deferential. Those findings are presumed to be correct unless rebutted by clear and convincing evidence.  Similarly, the state courts' resolutions of issues of law-including constitutional issues-must be accepted unless they are found to be "contrary to" clearly established precedent of the Supreme Court of the United States or involved an "unreasonable application" of such precedent. *Williams v. Taylor*, 529 U.S. 362 (2000).  It is not enough that the federal courts believe that the state court was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." *Id. Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002).

**Ineffective Assistance of Counsel**

To have a facially valid claim alleging ineffective assistance of counsel, Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland*'s two-part test requires Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*.  However, if a claim fails to satisfy the prejudice component, the

3

court need not make a ruling on the performance component. *Id*. at 697.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id*. (citations omitted).

## DISCUSSION

### Ground One

In Ground One, Petitioner asserts that the state trial court erred in denying his motion to suppress the statements he made to the detectives. Petitioner contends that the statements were procured in violation of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). He argues that the state court's determinations that he was not in custody for *Miranda* purposes, and that his statements were voluntary, were based on an unreasonable determination of the facts in light of the evidence.[3] Specifically, Petitioner argues that he made the statements to the detectives while he was in custody, and that the statements were involuntary because the detectives "denigrated the importance of the *Miranda* warnings," and coerced him into making the statements by telling him that he could not get a plea agreement unless he first gave a statement, and implying that if he gave

---

[3]Petitioner does not deny making the statements about which he now complains.

4

a statement, the police would approach the prosecutor about a plea agreement for Petitioner.

As the date for Petitioner's trial approached, defense counsel filed an amended motion to suppress inculpatory statements Petitioner made to law enforcement officers on January 28 and 29, 2004 (Respondent's Ex. 1, Vol. I at 57-66).[4]  A hearing on the motion was held on August 3, 2005 (Respondent's Ex. 1, Vol. VII at record pages 604-734). After reviewing the videotape of Petitioner's statements, hearing the testimony of Petitioner's step-mother and father, Detective Brewer, and T.J. Merry (who helped Petitioner bury the victim's body), and hearing argument by counsel, the state trial court took the matter under advisement.  On August 9, 2005, it entered a written order denying the amended motion to suppress:

> 1. In August, 2003, the Sarasota Sheriff's Office began an investigation into the disappearance of Shane Patrick.
>
> 2. Based on information provided to the Sarasota Sheriff's Office months later by David Davenport, a search warrant was executed on January 26, 2004 on the property of T.J. Merry, at which time Shane Patrick's body was discovered. The information provided by David Davenport identified the Defendant as being involved in the murder of Shane Patrick.
>
> 3. On either January 27, 2004 or January 28, 2004, a story appeared in the local newspaper that stated that a body had been found and that the person had died through homicidal violence.
>
> 4. After the article appeared in the newspaper, the Defendant contacted his father, and told his father that he wanted to got to the Sarasota Sheriff's Office and speak with detectives. The Defendant's father, mother, and girlfriend took the Defendant to the Sarasota Sheriff's Office on January 28, 2004.
>
> 5. Sarasota Sheriff's detectives, based on their earlier conversations with David Davenport, considered the Defendant a suspect in Patrick's death. They were continuing to investigate the case, and had no immediate plans to contact the Defendant.

---

[4]It appears from the record that Petitioner made the statements beginning approximately at 10:00 p.m. on January 28th, and ending sometime in the early morning hours on January 29th (Respondent's Ex. 1, Vol. II at 207).

6. Detectives met with the Defendant at the Sarasota Sheriff's Office on the evening of January 28, 2004. At the time detectives met with the Defendant, he was not under arrest, and the detectives neither said not [sic] did anything to lead the Defendant (or any reasonable person in a similar position) to believe he was under arrest. In fact, detectives told the Defendant at the beginning of the conversation, after informing him of his <u>Miranda</u> rights, that, "[i]t doesn't mean you're under arrest. You haven't been charged or anything like that." Defendant was not handcuffed, was given a beverage and was given smoking breaks.

7. Defendant knew that detectives would eventually want to talk to him, and he chose to go to the Sarasota Sheriff's Office and speak with detectives to avoid detectives having to come to his house.

8. Defendant wanted to speak with detectives about his involvement in the homicide. He clearly told detectives,"...I want to tell you guys absolutely everything. I don't want to lie or beat around the bush..." He even stated that he had always been advised "...never to talk to a cop without an attorney present...," but due to his strong desire to speak with detectives, he chose to ignore that advice.

9. Defendant, in coming to the Sarasota Sheriff's Office, was hoping for a plea agreement. The detectives told Defendant that plea agreements "can happen sometimes," but at no time implied that a plea agreement would result from Defendant speaking with detectives. Defense counsel argues that prior to giving details about his involvement in the homicide, Defendant is seen on the videotaped interview shaking his head (side to side), suggesting unwillingness to speak. The Court has carefully watched the videotaped interview, and although the Defendant is seen shaking his head (side to side) and then shrugging his shoulders, these movements were not in response to any question regarding willingness to speak. Indeed, within seconds of these movements, Defendant states, "I want to talk...I just...want to get everything off my conscience and I want to be able to eat. I'd like to be able to sleep, like not to worry..."

10. Defendant knew that by confession to detectives that he would likely be arrested. In fact at one point in the interview he asked,"[a]nd pretty much no way in hell I'll ever get bail or anything like that to go out and work, is there?"

11. Prior to making any admissions, Defendant was informed by detectives

    a. that he had the right to remain silent;

    b. that anything he said could and would be used against him in a court of law;

c. that he had the right to talk to a lawyer and have him present while being questioned;

d. that if he could not hire a lawyer, one would be appointed to represent him if he wished before questioning;

e. that he could decide at any time to exercise these rights and not answer any question or make any statements.

Detectives, after informing Defendant of these rights, asked him if he understood these rights. The videotaped interview clearly shows the Defendant nodding affirmatively.

At the time Defendant gave his statement to detectives, he had not been taken into custody or otherwise deprived of his freedom of action in any significant way. A reasonable person in Defendant's position would not have felt, immediately prior to the giving of his statement, that he was in custody. Cotton v. State, 901 So. 2d 241 (Fla. 3d DCA 2005). Miranda warnings and a waiver of the rights associated thereto were not required. In reaching this conclusion, the Court relies on the findings above, and especially on the fact that defendant initiated the contact with detectives, came to the Sarasota Sheriff's Office on his own, was never handcuffed, was never confronted with specific evidence of guilt, and detectives did nothing to suggest that Defendant was in custody. See Ramirez v. State, 729 So. 2d 568, 574 (Fla. 1999). The fact that the rights were read does not suggest that Defendant was in custody. Rather, the reading of the rights and Defendant's acknowledgment of understanding the rights further support the Court's finding of voluntariness of the statement.

Although Defendant was certainly hoping for a plea bargain, a careful review of his statement does not show any explicit suggestion of leniency, nor any express quid pro quo bargain for the confession. Accordingly, Defendant's statements were not rendered involuntary on that basis.

(Respondent's Ex. 1, Vol. I at 111-14).

This claim was also raised by Petitioner on direct appeal (Respondent's Ex. 2 at 18-25). The state appellate court per curiam affirmed the judgment of conviction (Respondent's Ex. 5); *Burch v. State*, 940 So.2d 431 (Fla. 2d DCA 2006) [table]. Clearly, Petitioner was afforded a full and fair opportunity to develop the factual basis for this claim before the state courts.

The state court applied the correct standard of review for the admissibility of evidence related

to statements made by a defendant to a law enforcement officer, as enunciated by the Supreme Court. *Miranda*, 384 U.S. at 469-73. Therefore, to establish that he is entitled to relief on this claim, Petitioner must establish that the state trial court incorrectly applied this standard in reaching its determination that his statements to law enforcement on January 28 and 29, 2004, were admissible evidence.

In *Miranda*, the Supreme Court held that evidence obtained as a result of a *custodial* interrogation is inadmissible as having been obtained in violation of the Fifth Amendment unless the defendant was first advised of his right to have counsel present, his right to remain silent and if he gave up those rights, anything he said could be used against him. *Miranda*, 384 U.S. at 469-73. The concern which led to the *Miranda* opinion was that the "interrogation environment" created by the interplay of interrogation and custody would subjugate the individual to the will of his examiner, undermining the privilege against compulsory self-incrimination.

In both Federal and Florida courts, the special procedural safeguards outlined in *Miranda* are triggered only where a suspect in *custody* is subjected to interrogation, i.e., *Miranda* warnings are not required if a suspect is not in custody when interrogated. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *Davis v. State*, 698 So.2d 1182 (Fla. 1997), *cert. denied*, 522 U.S. 1127 (1998). "A suspect is not in custody. . .unless under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave." *Hillary v. Sec'y for the Dep't of Corr.*, 294 Fed. Appx. 569, 572 (11th Cir. 2008) (unpublished) (citation and internal quotations omitted).

In the present case, the facts surrounding Petitioner's statements to the detectives are largely

undisputed.  The record from the suppression hearing reflects that on or about January 28, 2004, a story appeared in the local newspaper which stated that the body of the victim had been found (Respondent's Ex. 1, Vol. VII at record pages 612-15). On January 28, 2004, Petitioner contacted his father, and told him that he wanted to got to the Sarasota Sheriff's Office and speak with detectives regarding the victim (Id. at record page 615).  Petitioner's father, mother, and girlfriend took Petitioner to the Sarasota Sheriff's Office on January 28, 2004 (Id. at 616-17).

Sergeant Brewer testified that when Petitioner and his family arrived at the Sheriff's Office, Petitioner never gave any indication that he did not want to talk to law enforcement (Id. at 630). Petitioner and Brewer walked to the interview room (Id. at 631).  Prior to entering the room, Brewer gave Petitioner a routine nonintrusive patdown (Id. at 631-32).  Brewer's practice was to read an interviewee his or her *Miranda* rights, even if the interviewee had voluntarily come to see him (Id. at 634-35).  Therefore, before interviewing Petitioner, Brewer read Petitioner his *Miranda* rights (Id.).

During the interview, Petitioner did most of the talking, volunteered information, and never indicated that he did not want to talk about an issue (Id. at 637).  Petitioner took two breaks during the interview to go outside the building the building to smoke (Id. at 633).[5]  At no time prior to or during the interview was Petitioner handcuffed or physically restrained (Id. at 659).  Brewer testified that during the time Petitioner was with him in the employee area of the Sheriff's Office where the interview room was located, Petitioner would have been free to leave the Sheriff's Office at any time had he requested to leave (Id.).

---

[5]Brewer escorted Petitioner outside the building because they went out an employee exit door that automatically locks, and requires a key to unlock in order to get back inside the building (Id. at 630).

The transcript of the videotape of the interview reveals in pertinent part that Brewer told Petitioner that "Miranda Rights do apply.  It doesn't mean you're under arrest.  You haven't been charged or anything like that.  It's just you know how you stand, you know, talking to us, okay?" (Respondent's Ex. 1, Vol. II at 208).  Immediately after Brewer read Petitioner his *Miranda* rights, Petitioner stated "I want to tell you guys absolutely everything."  (Id. at 209).  When the interview started, Petitioner knew that he was not under arrest because later in the interview, after he made several incriminating statements, he asked "when are you guys going to arrest?"  (Id. at 224).

The factual finding by the state trial court that Petitioner was not in custody at the time he gave his statements is supported by the record.  Under the totality of the circumstances, a reasonable man in Petitioner's position at the time of his interview would not have felt a restraint on his freedom of movement that could fairly be characterized as that degree associated with a formal arrest.  *See United States v. Phillips*, 812 F.2d 1355, 1360, 1362 (11th Cir. 1987) (suspect was not in custody where he drove himself to a police station in response to a message left by a police officer, was not placed under arrest, was not restrained, and the officers did not resort to any sort of physical or psychological pressure to obtain a statement).  Petitioner has not overcome by clear and convincing evidence the presumption of correctness accorded the state court's findings of fact.  28 U.S.C. §2254(e)(1).[6]

Petitioner's claim that his statements were coerced because the detectives told him that he could not get a plea agreement unless he first gave a statement, and they implied that if he gave a statement, they would approach the prosecutor about a plea agreement, also does not warrant federal

---

[6]Because Petitioner was not in custody at the time he made the statements, his claim that his statements were involuntary because the detectives "denigrated" the *Miranda* warnings does not warrant relief since *Miranda* warnings were not required.  *See Rhode Island v. Innis*, 446 U.S. at 300.

habeas relief.  During the interview, the following exchange took place between Petitioner and

Brewer:

> Petitioner: I was just wondering most cases (inaudible) the fir. . ., the first person to
> speak, it's like a plea agreement, correct?
>
> Brewer: That can happen sometimes.
>
> Petitioner: Is there any way, fucking that I can get one?
>
> Brewer: The only one who can grant that to you would be a prosecutor, or if we go
> to a prosecutor.
>
> Petitioner: Or, would I need to get that before I talk, or after?
>
> Brewer: They, they don't know what you're going to say up front.  The thing is they
> don't go that way.
>
> Petitioner: They can get you front to back.
>
> Brewer: But like I said I got a, have an idea (inaudible).

(Respondent's Ex. 1, Vol. II at 210).

The state trial court correctly found that the officers did not make "any explicit suggestion

of leniency, nor any express quid pro quo bargain for the confession."  (Respondent's Ex. 1, Vol. I

at 114).  Furthermore, to the extent Petitioner argues that Brewer implied that if Petitioner gave a

statement, Brewer would approach the prosecutor about a plea agreement, a promise to make

cooperation known to a prosecutor with no guarantee of more lenient treatment is not an illegal

inducement to a confession.  *See United States v. Nash*, 910 F.2d 749, 752-53 (11th Cir. 1990)

(promise to make cooperation known to the United States Attorney's Office with no guarantee of

more lenient treatment is not an illegal inducement to a confession); *United States v. Davidson*, 768

F.2d 1266, 1271 (11th Cir. 1985) (statement to suspect that his "cooperation would be passed on to

judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary").[7]   The record establishes that Brewer did not promise Petitioner that the prosecutor would offer Petitioner a plea agreement or otherwise show Petitioner leniency in exchange for Petitioner's confession.   Petitioner may have hoped that his confession would lead to a favorable plea offer, but nothing Brewer said would have led Petitioner to reasonably expect that his confession guaranteed one.

To the extent Petitioner argues that his confession was coerced because Brewer impliedly misrepresented that Petitioner had to give a statement before the prosecutor would offer him a plea agreement, the claim does not warrant relief.   First, there is no indication from the record that Brewer's alleged implied statement was false, i.e., there is no indication that the prosecutor in Petitioner's case would have considered offering a plea to Petitioner without Petitioner first giving a statement.   Second, even if Brewer's statement was a misrepresentation, false statements by officers made to induce confessions do not, in and of themselves, lead to a finding of coercion, because courts must view the totality of the circumstances.   *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (interrogators misrepresenting to the defendant that his co-defendant had already confessed held no ground for finding defendant's confession involuntary).   Finally, a promise of leniency will not render a confession involuntary unless it overcomes the confessor's free will and impairs his capacity for self determination. *See Culombe v. Connecticut*, 367 U.S. 568, 576, 602 (1961).

The circumstances of which Petitioner complains are not sufficiently grave to warrant a conclusion that Petitioner's will was overborne.   Petitioner voluntarily went to the Sheriff's Office.

---

[7]The Court notes that under Florida law, an implied promise is not enough to establish that a confession was improperly coerced.  A promise of leniency from a police office is "only objectionable if [it] establish[es] an express quid pro quo bargain for the confession."  *State v. Moore*, 530 So.2d 349, 350 (Fla. 2d DCA 1988).

At the beginning of the interview, Petitioner told the detectives that "I want to tell you guys absolutely everything.  I don't want to lie or beat around the bush or anything" (Respondent's Ex. 1, Vol. II at 209), and "I want to get everything off my conscience and I want to be able to eat, I'd like to be able to sleep like to not worry."  (Id. at 211).  The detectives did not threaten Petitioner in any way, nor did they promise him anything in exchange for his confession.  During the interview, Petitioner was told that he was not under arrest, he was not handcuffed or restrained in any way, and he was allowed to go outside with an officer to take two smoke breaks.  Petitioner received warnings of his constitutional rights before he confessed (Id. at 209).  The detectives' statements during the interview were not enough in and of themselves to overcome Petitioner's will.

The voluntariness of a confession is evaluated on the basis of the totality of the circumstances surrounding that confession. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).  The totality of the circumstances of Petitioner's interrogation demonstrates that Petitioner's confession was not induced by false statements or promises.

The Court determines that the state trial court's conclusion that Petitioner's statements were not the result of custodial interrogation, and thus *Miranda* warnings were not required, and were not involuntarily coerced, was not unreasonable based on the record evidence, nor was it an unreasonable application of *Miranda* and its progeny.  Consequently, Petitioner's statements were properly admitted into evidence at trial. The state court's ruling did not result in a decision that was contrary to, or an unreasonable application of, United States Supreme Court precedent.  Accordingly, Ground One does not warrant relief.

**Ground Two**

In Ground Two, Petitioner complains that counsel was ineffective in failing to file a motion

13

to disqualify the trial judge.  In support of his claim, Petitioner asserts that in September 2002, Adam Tebrugge, one of the Assistant Public Defenders who represented him during the criminal proceedings,[8]  had been an opponent of the trial judge, Charles Roberts, in the primary judicial elections for the Twelfth Judicial Circuit of Florida (Judge Roberts ultimately won the election). Petitioner argues that under Florida law, "a trial judge is required to recuse himself in any case, within two (2) years, of an election, when one of the election contestants appears before the court." (Dkt. 2 at 8).  Petitioner opines that because the time period between the election and the trial judge's assignment to Petitioner's criminal case was less than two years, had counsel filed a motion to recuse the judge, the judge would have been compelled to grant it.  Petitioner further argues that he was prejudiced by counsel's failure to file the motion because the trial judge's bias against defense counsel deprived Petitioner a fair trial.

In state court, Petitioner raised this claim in Ground V of his 3.850 motion (Respondent's Ex. 13 at 23-25).  In denying this claim, the post conviction court stated:

> The Defendant claims counsel should have filed a motion to recuse the trial judge, against whom defense counsel had run for judge, a position ultimately won by the trial judge in 2002. The Defendant contends that Judicial Canon 3(E)(1)(a) was violated by the trial judge in that he had a bias or prejudice against the Defendant's attorney.

> The State Attorney responded that the court should deny the Defendant's claim because the Defendant has not shown that even if counsel had made a motion for the trial judge to be disqualified, it would not have been granted because the grounds were legally insufficient.  The State pointed out that the defense counsel did not run in the final election against the trial judge, but only the primary. Finally, the State pointed out that under the law, disqualification would have been appropriate within two years of the election, but thereafter, it would not have been required.

---

[8] The record shows that Petitioner was also represented by John Scotese, A.P.D. (See for example Respondent's Ex. 13 at 25).

14

The Defendant's motion is denied. It is clear that based upon the exhibit attached to the Defendant's Motion and the State's response, that the election involving the trial judge and defense counsel was in September, 2002. Defense counsel was not in the general election, only the primary.

The trial in the instant case occurred more than two years after the election. (See attached Trial Record). See Tower Group v. Doral Enterprises Joint Ventures, 760 So. 2d 256, 257 (Fla. 3d DCA 2000)(observing that trial judge should have been disqualified from case involving attorney opponent in the judge's reelection campaign). See also Barber v. MacKenzie, 562 So. 2d 755, 758 (Fla. 3d DCA 1990)(observing that post-election disqualification should normally be for a period of two years, until considering all the circumstances, the judge's impartiality cannot be reasonably be questioned). Here, the Defendant's allegations do not establish that the trial judge was not impartial during the trial and the allegations fail to satisfy the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Trial counsel was not ineffective in failing to file the motion, as it was not well founded under the caselaw and it would have been properly denied by the trial court. Additionally, as the State points out, the trial court's rulings were upheld on appeal and the sentence given for first degree murder is a mandatory sentence, with no discretion given the sentencing judge. As a result, the Defendant fails to show that he was prejudiced by his attorney's failure to file a motion to disqualify the trial judge.

(Respondent's Ex. 16 at 7-9).

To the extent Petitioner relies on his underlying state law arguments, the state courts (the post conviction court and the appellate court) answered the question of what would have happened had his counsel sought recusal pursuant to state law. Consequently, Petitioner cannot show either deficient performance or resulting prejudice from counsel's foregoing the proposed motion for recusal. *See Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984) (although ineffective assistance of counsel is a question of federal law, when the answer to the question turns on whether counsel should have raised issues of state law, § 2254(d) requires the federal court defer to the state court's decision regarding its own laws).

Petitioner argues that the state post conviction court's denial of the claim was based on an unreasonable determination of the facts because the court "erroneously calculated the two (2) year

time period by using the time period between the election and trial instead of the election and [Judge Roberts] assignment to the case." This argument fails for two reasons. First, the determination of whether the two year period encompasses either the time between the election and trial, or the time between the election and the judge's assignment to the case, is a matter of law, not an issue of fact. Petitioner has cited no authority supporting his position that the two year period encompasses the time between the election and the judge's assignment to the case. Nor does he dispute the post conviction court's factual finding that trial started more than two years after the election.

Second, even if the two year period does encompass the time between the election and the judge's initial assignment to the case, Petitioner fails to allege when Judge Roberts was assigned to his case. Therefore, Petitioner does not show that less than two years expired between the election and the date on which Judge Roberts was assigned to the case.[9] Consequently, Petitioner does not establish that the state courts' adjudication of this claim was based on an unreasonable determination of the facts.

Finally, Petitioner does not allege facts that show counsel overlooked a meritorious basis for seeking the judge's disqualification on federal due process grounds. *See Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975) ("Concededly, a 'fair trial in a fair tribunal is a basic requirement of due process.' *In re Murchison*, 349 U.S. 133, 136 (1955).").  At least one reasonably competent attorney at the time could have determined that the alleged judicial bias did not raise a due process concern as to the fairness and impartiality of the judge.

---

[9]According to the Sarasota County Clerk of the Circuit Court's Progress Docket in Petitioner's case, Judge Roberts' name first appears in a docket entry on November 18, 2004 (Respondent's Ex. 1, Vol. I at first page of Progress Docket).  Prior to that entry, it appears that the Honorable Harry M. Rapkin was the judge assigned to the case (Id.).

Petitioner points to no evidence which indicates actual judicial bias.[10] Nor do his allegations overcome the presumption of the judge's honesty and integrity. *Winthrow*, 421 U.S. at 47. The facts asserted by Petitioner are not such that a reasonable person would be convinced that bias existed in Petitioner's case. *See e.g., Tafero v. Wainwright*, 796 F.2d 1314, 1322 (11th Cir. 1986) (rejecting habeas petitioner's due process claim regarding state court judge's denial of motion to disqualify, finding no showing of personal bias and alleged facts not such that reasonable person would be convinced that a bias existed). Accordingly, even if counsel had moved to disqualify the trial judge on either state or federal constitutional grounds, Petitioner cannot show that there was any reasonable probability of a different outcome.

The state court decision resulted in a reasonable decision under either prong of *Strickland* and a reasonable determination of the facts in light of the evidence. Accordingly, Ground Two does not warrant relief.

**Ground Three**

In Ground Three, Petitioner complains that counsel was ineffective in failing to preserve for appeal the introduction of a photograph of the victim[11] during the testimony of the victim's mother. Petitioner asserts that counsel incorrectly objected to the photograph on the basis of relevancy. He argues that counsel should have instead objected on the ground that the mother of the victim was the

---

[10]In *Hendrix v. Secretary, Florida Department of Corrections,* 527 F.3d 1149 (11th Cir. 2008), the Eleventh Circuit concluded that "there is no Supreme Court decision clearly establishing that an appearance of bias or partiality, where there is no actual bias, violates the Due Process Clause or any other constitutional provision." *Id.* at 1153. Subsequently, however, the Supreme Court has decided that in some "extraordinary situations," the probability of actual bias is enough to violate due process. *United States v. Rodriguez*, 627 F.3d 1372, 1382 (11th Cir. 2010) (citing *Caperton v. A.T. Massey Coal Co.*, _ U.S. _, 129 S.Ct. 2252 (2009)). Petitioner has wholly failed to show the "probability of actual bias" in his case.

[11]The photograph depicted the way the victim looked at or near the time of death (Respondent's Ex. 1, Vol. X at 93; Vol. IV at 528).

person through whom the State was seeking introduction.  Petitioner argues that under Florida law,

a family member should not be the one through whom a photograph of the victim should be

introduced.  Petitioner argues, therefore, that he was prejudiced by counsel's failure to raise the

"proper" objection because it deprived him the opportunity to correct the error on appeal.

In state court, Petitioner raised this claim in Ground I of his 3.850 motion (Respondent's Ex.

13 at 3-9).  In denying this claim, the post conviction court stated:

> The Defendant alleges that Carol Mullins, the victim's mother, testified at
> trial and identified a pre-death photograph of the victim, Shane Patrick. Trial counsel
> objected on the grounds of relevancy, but the court overruled the objection. The next
> day, counsel filed a motion for mistrial in which he cited Ashmore v. State, 214
> So.2d 67 (Fla. 1st DCA 1968), which supported the position that the photograph
> should not have been introduced through a family member of the victim because it
> interjects issues into the trial which do not fall within the scope of the charges on
> which the defendant is being tried. The Defendant argues that counsel recognized that
> his objection at trial on relevancy grounds may not have been the proper objection
> and the State pointed out that the court's ruling was correct given the relevancy
> objection. The trial court denied the Defendant's Motion for Mistrial, citing trial
> counsel's failure to make the proper objection and therefore, counsel had not
> preserved the issue. The Defendant contends he was prejudiced because the witness
> reacted emotionally in identifying the photograph before the jury and counsel's
> objection failed to preserve the issue for appeal and failed to incorporate the caselaw
> he cited in his Motion for Mistrial.
>
> The Defendant's motion is denied. First, the trial court noted, when denying
> defense counsel's motion for mistrial, that it did not think the admission of the
> photograph was prejudicial in the way it was done. (See attached Tr. 128-134). In
> fact, the trial court specifically found that the witness, when she identified the
> photograph was not visibly emotional and it was not even observed by the court until
> after defense counsel had pointed it out. Further, the transcript of Ms. Mullins's
> testimony does not reflect that she became emotional at the time of the identification
> of the photograph. (See attached Tr. 83-97). Under similar circumstances, the
> Supreme Court of Florida found that any error committed by the trial court would be
> harmless. See Peede v. State, 955 So. 2d 480, 501 (Fla. 2007)(observing that where
> family member testified about other matters besides the identification of the victim
> and even though there was little evidence that the State actually made a concerted
> effort to find an unrelated witness to testify regarding identification of the victim's
> body, any error in admission of the family member's identification testimony was

harmless). Even if counsel had properly preserved the issue, because the error would have been harmless, the Defendant has not shown the required prejudice for postconviction relief.

(Respondent's Ex. 14 at 2-3).

First, Petitioner fails to demonstrate that trial counsel was deficient in failing to object on the ground that the victim's photograph should not have been introduced through the victim's mother. In Florida, "*where an identity witness is available other than a member of the deceased's family*, use of the latter serves only to prejudice the jury against the defendant by injecting issues into the trial which do not fall within the scope of the charges on which the defendant is being tried." *Ashmore v. State*, 214 So. 2d 67, 68-69 (Fla. 1st DCA1968) (emphasis added). Petitioner does not allege, nor does the record show, that there was another identity witness available at the time of trial who could have testified that the photograph was of the victim, and that the photograph accurately depicted the way the victim appeared at or near the time of his death. *See Abram v. State*, 242 So. 2d 215, 216 (Fla. 1st DCA 1970) (finding that the rule announced in *Ashmore* did not require reversal, in part because "there [was] no showing in the record that other witnesses were available to the prosecution to identify the victim's body"). Moreover, in *Ashmore*, the appellate court held that "it was error *to prove the identity of the body of a deceased* by members of the family of the deceased when that fact could have been proven by other witnesses who were not members of the family." *Id.* at 68 (emphasis added). In Petitioner's case, the mother was used to prove how the victim appeared at or near the time of his death; she was not used to prove the identity of the body of the victim (see Respondent's Ex. 1, Vol. VII at 129-32). Consequently, Petitioner's reliance on

19

*Ashmore* is misplaced.[12]

Second, Petitioner fails to demonstrate that he was prejudiced by trial counsel's failure to object on the ground that the photograph should not have been introduced through the victim's mother. The state post conviction court concluded that Petitioner failed to show prejudice because had trial counsel preserved this issue for appeal, the error would have been harmless (Respondent's Ex. 14 at 3).[13] The state postconviction court, and in turn the state appellate court by its affirmance, have answered the question of what would have happened had defense counsel objected, pursuant to state law, to introduction of the photograph through the victim's mother. Petitioner cannot gain federal review of this state law determination. *See Alvord v. Wainwright*, 725 F.2d at 1291.

Petitioner has failed to cite to any decision of the United States Supreme Court that would indicate the state court's decision was contrary to *Strickland*, or demonstrate that the decision was based on an unreasonable determination of the facts. Accordingly, the Court finds that Petitioner has failed to show that he is entitled to federal habeas relief on Ground Three.

**Ground Four**

In Ground Four, Petitioner complains that counsel was ineffective in failing to cross-examine the State's firearms expert witness, Rosemary Jassoy. Petitioner asserts that the rifle allegedly used to shoot the victim was found and turned over to the Florida Department of Law Enforcement for ballistics testing. Due to corrosion on the rifle, Jassoy removed the bolt and firing pin from the rifle

---

[12]This Court notes that the state trial judge stated that he "always felt that that case law applied to an autopsy photograph or a photograph depicting the victim after death." (Respondent's Ex. 1, Vol. VII at 133).

[13]*See Peede v. State*, 955 So. 2d 480, 502 (Fla. 2007) ("any error that may exist in the admission of [the victim's daughter's testimony regarding the identification of the victim's body] was harmless").

and installed them on another weapon for test firing in order to determine if a match could be made

with the cartridge cases found at the crime scene.  Prior to trial, defense counsel filed a motion to

exclude Jassoy's testimony on the ground that Jassoy's testing procedures were unreliable.  The

motion was denied.  Petitioner argues that Jassoy's testimony was critical to the State's case because

it corroborated Petitioner's statements to police, and therefore counsel was ineffective in failing to

cross-examine Jassoy, apparently regarding the reliability of the ballistics tests.

In state court, Petitioner raised this claim in Ground III of his 3.850 motion (Respondent's

Ex. 13 at 10-19).  In denying this claim, the post conviction court stated:

> The Defendant argues that counsel failed to cross examine FDLE analyst
> Rosemary Jossoy [sic], a firearms senior crime analyst in Tampa. Ms. Jossoy [sic]
> was called by the State and she testified concerning her examination and testing of
> a rifle that was recovered that was alleged to have been used by the Defendant to
> shoot the victim. The rifle had been recovered from the water and barnacles were
> attached to the stock and it was in deteriorated condition, with the bore and parts in
> the firing mechanism used and corroded. Ms. Jossoy [sic] testified that she removed
> the firing pin and bolt, cleaned them and then inserted them into a reference weapon
> and the reference rifle was test fired. Trial counsel, as alleged by the Defendant, filed
> a pre-trial motion to exclude Ms. Jossoy's [sic] testimony in which he argued that her
> testimony was inadmissible because the comparison casings used should not have
> been allowed as proof that the crime scene casings were fired from the particular
> rifle recovered nor allowed to support the testimony that the crime scene casings
> could have only been fired from the weapon submitted to FDLE. Trial counsel argued
> that is was impossible to assess or verify Ms. Jossoy's [sic] testimony and therefore,
> her testimony was inadmissible opinion testimony. The Defendant acknowledges that
> counsel renewed his pre-trial objection at trial, but he never cross examined Ms.
> Jossoy [sic] about the issues that he raised in his motion to exclude her testimony.
> The Defendant argues that there was a possible faulty initial identification of the
> cartridge cases made by Ms. Jossoy [sic] and that any challenge would have affected
> her in court identification of the cartridge cases recovered from the scene.

> The State Attorney responded that the court should deny this ground without
> a hearing because the Defendant filed a pre-trial motion to exclude the testimony of
> Ms. Jassoy , a lengthy hearing was held on the motion and the court ultimately denied
> the motion, defense counsel renewed his objection at trial, thereby preserving the
> issue for appeal. The State argued that because the Defendant gave a full statement

admitting he shot, struck and buried the victim, there was never any issue or question about how the victim died and who killed him. The State argued that cross examining the expert on an uncontroverted issue would only undermine the defense credibility and would contradict the Defendant's own words and confession.

The Defendant's Motion is denied. As correctly pointed out by the State, the Defendant admits that counsel argued the pre-trial motion and renewed his objection to that evidence at trial, thus preserving the issue for appeal. It is unlikely, considering the Defendant's confession, that had counsel cross examined the expert, that the outcome of the trial would have been different. (See attached Tr. 140-175). Normally, a finding that counsel's actions may be reasonable trial strategy cannot be decided without benefit of an evidentiary hearing, however, the court finds that based upon the record transcripts of the Defendant's confession and the limited value of the cross examination that could have been conducted, it is appropriate to summarily deny this claim as the Defendant has failed to show the required prejudice for postconviction relief. See Williams v. State, 797 So.2 d 1235, 1238-1239 (observing that the defendant must show that counsel was deficient and that the prejudice was so serious that there is a reasonable probability that the result of the proceeding would have been different; and summary denial of tactical decision may be upheld where it is so obvious from the record that no evidentiary hearing was necessary).

(Respondent's Ex. 16 at 2-5).

The record reflects that prior to trial, defense counsel filed a Motion to Exclude Expert Witness Testimony (Respondent's Ex. 1, Vol. I at 25-26) in which defense counsel argued that the trial court should exclude as unreliable Jassoy's testimony that the sixteen rifle cartridge cases that were found at the crime scene were fired from the rifle that was recovered, and allegedly used to shoot the victim. At trial, defense counsel renewed his pre-trial objection to Jassoy's testimony (Id., Vol. V at 340-41, 361). Defense counsel, however, never cross-examined Ms. Jassoy about the issues that he raised in his motion to exclude her testimony (Id. at 342-68).

This claim may be denied on the prejudice prong of *Strickland*.[14] Petitioner argues that

---

[14]*See Chambers v. Sec'y, Dep't of Corr.*, 459 Fed. Appx. 852, 854 (11th Cir. 2012) ("If the defendant makes an insufficient showing on the prejudice prong, we need not address the performance prong, and vice versa.") (citing *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000)).

because Jassoy was a "key witness," counsel was ineffective in failing to cross-examine her. Therefore, Petitioner appears to implicitly argue that the failure to cross-examine a "key witness" gives rise to a presumption of prejudice. *See United States v. Cronic*, 466 U.S. 648, 658-62 (1984) (noting that "there are . . . circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified"). This Court disagrees.

In *Broadwater v. United States*, 347 Fed. Appx. 516 (11th Cir. 2009) (unpublished), the Eleventh Circuit Court of Appeals stated:

> "The decision as to whether to cross-examine a witness is a tactical one well within the discretion of a defense attorney. . . . Absent a showing of a single specific instance where cross-examination arguably could have affected the outcome of either the guilt or sentencing phase of the trial, a [petitioner] is unable to show prejudice necessary to satisfy the second prong of *Strickland*." *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (citations and internal quotation marks omitted). "Ineffective assistance . . . will not be found merely because other testimony might have been elicited from those who testified," though we have "found ineffective assistance where counsel failed to impeach the key prosecution witness with prior inconsistent testimony where the earlier testimony was much more favorable to the defendant." Id. at 1219-20 (internal quotation marks and citations omitted) (emphasis added). Though counsel may have performed deficiently in failing to impeach a witness, the defendant must still demonstrate that prejudice resulted from the deficient cross-examination. *See id.* at 1220.

*Id.* at 520-21.

Petitioner wholly fails to demonstrate that prejudice resulted from defense counsel's failure to cross-examine Jassoy. Petitioner fails to allege or show "a single specific instance where cross-examination [of Jassoy] arguably could have affected the outcome of. . .the trial[.]" Instead, Petitioner assumes prejudice or speculates that cross-examination of Jassoy could have affected the outcome of the trial. Speculation about what witnesses could have said is not enough to establish prejudice under *Strickland*. *Cf. Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) (In the

context of a claim of ineffective assistance of counsel, speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.).[15]

Furthermore, as the state post conviction court noted, there was other substantial evidence, including Petitioner's confession in which he admitted shooting and helping to bury the victim (Respondent's Ex. I, Vol. VII at 167-75), establishing that Petitioner shot and killed the victim.[16] Therefore, there is not a reasonable probability that the outcome of the trial would have been different had Petitioner's counsel cross-examined Jassoy.

Petitioner fails to show that the state courts' denial of this claim of ineffective assistance was an unreasonable application of *Strickland* or based on an unreasonable determination of the facts. Accordingly, Ground Four does not warrant relief.

## Conclusion

For the foregoing reasons, the Court finds that Petitioner is not entitled to federal habeas relief.

ACCORDINGLY, it is **ORDERED** that:

1. The Petition for Writ of Habeas Corpus is **DENIED** (Dkt. 1).

2. The **Clerk** shall enter judgment against Petitioner, terminate all pending motions, and close this case.

**CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS**

---

[15]Petitioner has failed to present any evidence or testimony indicating that Jassoy's ballistics tests were unreliable.

[16]The Court notes that defense counsel argued justifiable homicide as a defense (Respondent's Ex. I, Vol. IX at 612-19). Therefore, a critical cross-examination of Jassoy would have been inconsistent with Petitioner's defense of justifiable homicide.

**DENIED**

**IT IS FURTHER ORDERED** that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, Petitioner must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. See 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001). Petitioner cannot make the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**DONE and ORDERED** in Tampa, Florida, on ___*August 23rd*___, 2012.

JAMES D. WHITTEMORE
United States District Judge

SA:sfc
Copy to: Petitioner *pro se*
          Counsel of Record